Good morning. May it please the Court, Tim Wilborne for Appellant Potts. Looking back over the briefs, I'm not really sure what issues might be of concern to the Court, so I'll just start by asking, are there any specific issues the Court would like me to address? This case involves a continuation of benefits. Yeah, well, I call it a cessation of benefits. Well, I mean, the posture, and as I understand it, the standards are slightly different, the approach is slightly different than the initial determination. Quite a bit different. Yeah, so the ALJ in this case looked at the 1995 decision, ignored the 2000 decision. What's the difference? What's the material difference? If he had looked at the 2000 as the comparator, what would have been the effective difference in the outcome? Well, I don't think there would have been any difference, because no matter which of the two decisions he used as the comparison point decision, the underlying basis for disability when Mr. Potts was determined to be disabled was his pain. And the original, what in the briefs I call the prior ALJ, found that he was disabled due to pain. That is his express finding, that he has the capacity to work, except that he can't basically do any work due to pain. In the 2000 review, they continued the benefits because he was still in a disabling amount of pain. Now, if what you're getting at is the issue of the dizziness or the syncope or whatever... Yeah, that was part of it. I mean, the ALJ seemed to think, well, there were these improvements, but if he's looking, let's assume there were these improvements over time, if you were looking at 95 to 2000, the ALJ in that case said, well, there are improvements, but not enough to eliminate disability. I think by 2000, what you may be getting at here is that there wasn't any... You'll probably find out if you let me finish my question. You'll probably find out what I was getting at. Okay, sorry. Okay, just so I make sure that you're answering my question or my question is comprehensible, if you look at in 2006 when this hearing occurred, tell him we'll call him back. I'll call him back. I may be missing the boat here, but as I understand it, one of the arguments is that he looked at the wrong... He should have looked at 2000. If he's looking at a range of improvements, because this is a continuation of benefits, the improvements, some of which had occurred pre-2000, didn't move the ALJ in 2000 to cease benefits. So if the ALJ is looking at it in 2006 and goes all the way back to 1995, he's going to say, well, he'll see a greater degree of apparent increase in improvement. You're absolutely correct. Why I thought that the comparator was relevant. Well, it is, and I think the reason it's relevant is related to one of the points I argue in the brief, and that has to do with the SYNCO. In the 1995 decision, the ALJ mentioned it but found that it wasn't a severe impairment, and a severe impairment is defined as one that has a significant impact on the residual functional capacity. In 2000, as I think you're properly pointing out here, there wasn't still evidence of any SYNCO. And so had the ALJ properly looked at the 2000 comparison point instead of going all the way back to 1995, he wouldn't have gone off on that wild goose chase. Was it legal error not to do the comparison to the 2000 evaluation? The law requires that when they do a comparison, well, let me use the proper terminology, when they do a continuing disability review, which is the current one, they must compare the most recent decision in which the claimant was found to be disabled. And as Judge Fischer points out, that would have been the case. It's clear here from the ALJ's decision, the current decision, that he didn't do that. So it was legal error to compare it with the 1995 decision rather than the 2000. And so as Judge Fischer has correctly pointed out, that would make a difference because there wasn't any SYNCO. So as the ALJ goes through his analysis, he gets to the later steps where he evaluates his residual capacity, residual functional capacity. And when he does that analysis, he discredits Mr. Potts. He does. He says that he doesn't give much weight to his testimony about his pain. Yes. And I've already said that. Did that also, did he also use that, by discrediting him, did he also discredit him when he made the determination that he didn't suffer, that he had not suffered, that he had not improved in his medical condition at step 3? I don't understand the question. Well, to what extent did the ALJ's decision to discredit Mr. Potts's pain testimony affect his decision at step 3 that he had improved medically, that there had been an improvement in his medical impairment? I think it did affect the ALJ's determination at that step, but it shouldn't have, because the determination of whether there's been medical improvement is supposed to be based on signs, symptoms, and laboratory findings as specified in 20 CFR section 404.1594. And so he points to the fact that Mr. Potts is able to do greater, the ability to engage in his living arrangements, work and work around the house, do errands, ride his motorcycle. It talks about riding his motorcycle and whatnot. Why aren't those signs and symptoms? Well, because signs and symptoms are defined in the regulations, and they're medical signs and symptoms. These activities that you've listed are what we call activities of daily living. The signs are what doctors observe, you know, like reflexes, that kind of thing. Symptoms are what the claimant reports as wrong, and laboratory findings are, you know, like blood tests or MRIs or whatever. But activities of daily living are not signs, symptoms, and laboratory findings. And so if I understand your question, my answer is that the ALJ did commit error by relying on that at that stage of the analysis in order to determine that there had been medical improvement. Essentially what the ALJ did is sidestepped the issue of whether or not there had been medical improvement and just re-evaluated the man's credibility. And that's not what a continuing disability review is all about. You're supposed to run from the matter. Breyer. What do you do with Dr. Burry's report? Dr. Burry. Well, Dr. Burry is a general practitioner who examined this man physically, and he said that he thought he was exaggerating his pain complaints. But if you look at the psychological evaluations, and that would be Dr. Phillips and Dr. Reed, both of those doctors, after conducting psychological evaluations, determined that the magnification of the pain reports, the magnification is due to psychological factors. And, in fact, even the ALJ found that he has a psychologically-based pain disorder. But then the ALJ didn't follow up on it and attribute the, quote, unquote, excess pain to that psychologically-based pain disorder. If I may, I'd like to reserve. What remedy do you seek, assuming we agree with you? I believe, Your Honor, the remedy in a cessation case is reinstatement of benefits, and then it would be sent back. You don't think it's a remand for redetermination? I do. But it's the remedy is remand with an order to reinstate benefits and then go with the redetermination. I think the agency has every right on remand to continue this process of determining whether the man is disabled. But under the AIDA case cited in the briefs, the court should also order reinstatement of benefits pending the determination of the outcome on remand. Which would mean that if they decided on the new evaluation, he'd still have gotten benefits for a period up to that point. Yes, his benefits would be reinstated pending the outcome. And it's possible, even, that after the conclusion of the proceedings on remand that the ALJ would redo things and look at the evidence and address all the points that I've made and, you know, make a legally defensible conclusion. No, I understand.  And he might go back and say, well, he was no longer disabled as of 2003, just like he did here. I see. And then what would happen? They would charge him with an overpayment. I see. Okay. Thank you. Thank you. We'll hear from the government. Your Honor, this is David Burdett representing the Commissioner, Michael Astrum. With regard to the comparison point decision, I think it is probably correct that it is correct that the comparison point is 2000, but I disagree that there was not any medical improvement since 2000, from 2000 to 2003, the time at which his disability was found to cease. That may be. But just let me ask you if you would address Venita's, because we just had I was just on a panel in Hawaii. We had virtually the same kind of case where the administration was saying, well, look, it really doesn't make any difference. But the Venita's case says, look, if it's legal error, if they're not doing what they're supposed to do, then we kick it back and have them do it right rather than us trying to say, in effect, it's harmless error. Why isn't this just a simple, you used the wrong one, you acknowledge that, therefore it's legal error, so at least on that ground it should go back? Well, I answer, possibly unsatisfactorily, but I answer that it is harmless error because when you look at the fact that there is, if it were to go back, if it were to go back, and we assume that the same set of facts were found, and we look at the fact that there was improvement in the gentleman's medically determinable impairments, now Tim may quarrel with that, but I assert that there was, from 2000 to 2003, then it would be a waste of everyone's time, the court's time, the administration's time, Mr. Potts' time, and everything else, to go back just for that determination. And we already know that there was an improvement from 2000 to 2003. Was there a finding, unless you just wish to have a follow-up, was there a finding by the ALJ that Petitioner is capable of sustainable work activity? I mean, he found improvement, but that's not, his chairs are not made for people. Clearly he found improvement, but it's not enough that you have improvement, you have to have improvement to the point where you can work, to put it in plain English. And I wasn't sure that there was a finding by the ALJ that he had improved to the point where he can maintain a job. Can you speak to that or point me to where the ALJ is? Yes, there is, Your Honor, and that is the burden of the whole section with the VE. We go through the eight steps. Well, just for me, because I'm not an expert in these things, can you just walk me through? So, on page 16 of volume 2 of the record, which is page... This is the base stamp 16, which is 5 of 5. Page 5 on the ALJ's decision. Very good. The one that has the heading 6. Correct. Okay. So, heading 6 is medical improvement occurred as of September 1, 2003. Right. We're tabling for now the discussion of whether it was correctly found to have been improved from 1995 or 2000. Yes, I think you answered Judge Fischer's questions, and Judge Fischer said he didn't have a follow-up, so I was moving on to another topic. Okay. If that's okay. Okay. Heading 7 is his residual functional capacity. Just speak into the mic, please. I'm sorry, Your Honor. Heading 7 is his... Put it down. Yeah, there we go. There we go. So, what I'm looking at, this is in paragraph number 6. Right. I'm just marching through it. In paragraph number 7 is the residual functional capacity finding. Paragraph number 8 is the next step in the 8 steps says it's related to the ability to work, because it resulted in an increase in the RFC. He had a greater RFC, greater... Without necessarily being able to work. Am I wrong about that? Correct. Yes, Your Honor, you can. And then as we go through... I mean, you're a little better, but you have to sort of go over the threshold where somebody can say, yes, you can hold on a job. That's right, Your Honor. Okay, so where is that? Similarly to what we do in normal non-continuing disability review social security cases, he relied on the VE testimony for that. So if you move ahead to... I'm not asking for support. I'm just asking for a find, where he finds that. We can go into support next. I just want to make sure I see where it is. Bates Stamp 19, page 8 in the administrative decision. Bates Stamp 19. Yeah. Heading 15. Item 15. Okay. Okay. Ticketer, counterclerk. Is that what you're saying at the bottom there? That's what he found? I'm sorry, Judge? Ticketer or... Ticketer or counterclerk. Counterclerk. That's correct. And gatekeeper. And gatekeeper. But we can see that gatekeeper is not an appropriate job for him because it was... Well, gatekeeper is a semi-skilled job, and we're making a finding that he doesn't have skills to transfer to that job. So we're relying on ticketer and counterclerk. And there are sufficient jobs here in Oregon for that? Yes, there are, Your Honor. Jobs existing in significant numbers in the national economy. It's... Those jobs exist in... There are hundreds of thousands in the national economy. Okay. Is he required to move unless it's right? Well, the requirement is for jobs not existing in the state of Oregon, but regulatorily jobs existing in significant numbers in the national economy. Okay. So I think the answer is yes, if they don't... Well, I want to back off that because really the question is not whether he is required to move or do this or that, but whether these jobs are out there in the national economy in significant numbers. We do say in the decisions, or the ALJs frequently ask the VE, do these jobs exist in the state of Oregon, in the state of California, et cetera, and in what numbers? But they also ask them in the national economy. And I wish that they would just ask them do they exist in the national economy every time because that, in fact, is the matter that the regulations prescribe to be determined. And what support is there for his ability to perform these jobs? That is the findings of the doctors and the findings of, for example, Dr. Burry, that he had excellent muscle tone and strength and range of motion as of 2003. The fact that his activities of daily living are greater than one would expect, both from the social aspect and from a physical aspect, versus what a person with Mr. Potts's claimed disability would exhibit. It looks to me like what the ALJ did was just to discredit his pain testimony. That's a fact, Judge Bias. That's basically what he did. That's right. Where does he point to the signs and symptoms, the medical signs and symptoms, that reflect an improvement in his medical impairments that were found to exist in the relevant continuing disability determination, which would have been in 2000? I think Dr. Burry's opinion answers that question, Your Honor. I think that in 2000, although he had some improvement in the issue of the headaches, dizziness, and syncope from 1995 to 2000, but in 2000 he still had a limited range of motion. And what was the finding about his strength? He had a limited range of motion and strength. But Dr. Burry, in 2003, said that he had unlimited range of motion and excellent physical strength and muscle development. What about the knee? I beg your pardon, Your Honor. Go ahead. And that, Judge Fischer, is what I'm relying on to say that from 2000 to 2003, the decision would have come out the same anyway, because that's a medical improvement that's related to his ability to perform work functions. So whether we look at 95 or whether we look at 2000, that's a relevant medical improvement. So it would have come to the same thing. And then the ALJ would be put to evaluating this gentleman's credibility, asking the same questions of the vocational expert, and presumably receiving the same answers. If one looks at the CPD determination, the determination in 2000 and the one in 2003, the little summary comparison that's in the record, there really isn't much difference. No, there isn't, Your Honor. So the only thing it looked to me like they discredited his pain testimony, which is just another way of going back to what happened in 2000. In 1995, essentially redo the 95 decision. Well, I guess I would say, Your Honor, that the current ALJ really didn't agree with what the ALJ did back in 1995. Well, it may be, Your Honor. It may be that he wouldn't have found it. But I still think that the current ALJ's decision followed the eight steps of the sequential evaluation process and didn't evince any bias or anything like that. I think we have to give him a presumption that he is doing his job fairly.  Thank you, Your Honor. Would you like to take a minute for rebuttal? The only point I'd like to make is that if there was any increase in his range of motion or anything like that, it's irrelevant in terms of science symptoms and laboratory findings because the severity of his pain, which was the underlying original basis for disability, never lessened. That's all I have. Okay. Thank you. Thank you. The case is signed. We'll stand for a minute.
judges: Kozinski, Fisher, Paez